**Norman R. HARRINGTON, Plaintiff, Appellant,**

**v.**

**R. Christopher ALMY, etc., et al., Defendants, Appellees.**

**No. 91–1409.**

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1991.

Decided Oct. 16, 1992.

Memorandum and Order on Denial of Rehearing Jan. 21, 1993

Warren M. Silver with whom Warren M. Silver, P.A., Bangor, Me., was on brief, for plaintiff, appellant.

Timothy C. Woodcock with whom Weatherbee, Woodcock, Burlock & Woodcock, Bangor, Me., was on brief, for defendants, appellees R. Christopher Almy and Michael Roberts.

Vernon I. Arey, Waterville, Me., for defendants, appellees David O. Cole and The City of Old Town.

Before BREYER, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

WOODLOCK, District Judge.

A police officer is drawn as a suspect into the widening gyre of a child sex abuse scandal in a neighboring municipality. The District Attorney for the County begins an investigation. The police officer is suspended by his City Manager pending the investigation. The investigation results in no criminal charges against the officer.

Nevertheless, the City Manager demands that the officer take a highly intrusive physical test of sexual arousal as a condition of reinstatement. The officer refuses. The officer is ultimately reinstated without taking the test but the District Attorney declines to prosecute any arrest the officer makes. As a consequence the officer will be assigned only less desirable desk duties with no prospect of the overtime work and pay customary for police officers.

The officer brought this civil rights action against the District Attorney and his deputy and against the City Manager and the City. The district court granted summary judgment. We affirm in part, finding that policies of absolute immunity insulate the prosecutorial defendants from the claims the officer raises. And we reverse in part, finding that the claims against the City Manager and the City for conditioning reemployment on submission to the physical test of sexual arousal cannot be disposed of on summary judgment and must be evaluated at trial.

I

In May, 1985, acting on reports of neglect and abuse, the Maine Department of Human Services ("DHS") removed four siblings (the "Lawrence children") from parental custody and placed them in a foster home. Several months later, in the fall of 1985, the children disclosed during counseling that they had been sexually abused by their parents, other relatives, and people who had lived in or frequented their mother's home in Bangor. Nine persons identified, including the children's parents, were indicted and ultimately convicted of sex crimes in cases investigated by the Bangor Police Department and prosecuted by the District Attorney for Penobscot County.

The Lawrence children continued alleging that many more people were involved in abusing them and other children. In early May, 1987, the plaintiff, City of Old Town Police Officer Norman R. Harrington, became one of those persons accused by the children. The allegation was made public during the testimony in mid-May of one of the children at the trial of one of the original nine persons indicted. In late May the children's foster mother told the Bangor Police that the children also claimed that a United States Senator, while in the company of Harrington, abused them.

* Of the District of Massachusetts, sitting by designation.

By December, 1987, the children had identified in excess of 170 individuals, in addition to the original nine, as persons who had abused them. On December 11, 1987, one child named as perpetrators of abuse two Bangor Police detectives who had been working on the case. Apparently having serious doubts as to the credibility of the children's allegations against those on the expanding list of persons accused, the Bangor Police and the District Attorney's Office sought no further criminal charges. Harrington was never indicted.

However, the collateral consequences to Harrington from the children's allegations were considerable. An investigation by the Department of Human Services prompted by the allegations resulted in Harrington's temporary loss of the custody of his own son,[1] and he was suspended from his police duties, albeit with pay, on May 20, 1987.

On March 8, 1988, Old Town's City Manager, defendant David O. Cole, met with the District Attorney for Penobscot County, defendant R. Christopher Almy, to discuss the status of the investigation. Almy stated that the Harrington investigation still was formally active although it "wasn't going anywhere." Almy said he still had concerns about Harrington and suggested that Harrington undergo an examination to assess the officer's sexual profile. Almy gave Cole a list of persons qualified to conduct such an examination. On March 14, 1988, Cole asked Harrington to consider resigning. Harrington refused and requested reinstatement.

By letter dated April 8, 1988, Cole informed Harrington that the City intended to reinstate him but asked Harrington to undergo "a psychological examination for suitability as a police officer." The examination was to be conducted by William O'Donohue, a Ph.D. psychologist affiliated with the University of Maine, who had been suggested for the task by one of the persons on Almy's original list. Harrington went to O'Donohue's office for the examination on May 9, 1988, but refused to participate after he learned that the evaluation was not the routine psychological testing customarily administered to police officers.

The efforts of the City of Old Town to conduct its own internal investigation into the allegations regarding Harrington were frustrated by the refusal of the District Attorney's Office and the Attorney General's Office to provide access to the Harrington investigatory file. On September 22, 1988, Cole and the City's labor attorney met again with defendant Almy. Almy reiterated his refusal to release the investigation file and declared that, should Harrington return to work, he would refuse to prosecute the cases of any person arrested by Harrington. Cole asked Almy to put the statement in writing; Almy provided such a statement by letter dated October 19, 1988.

On November 4, 1988, Cole ordered Harrington to submit to O'Donohue's psychological examination or be fired. As Cole then knew, O'Donohue's examination included administration of a penile plethysmograph, a procedure whereby Harrington's sexual profile would be assessed by the placement of a gauge on his penis while he viewed various sexually explicit slides involving both adults and children. Harrington refused to take the test and was suspended without pay. After a pretermination hearing, Cole informed Harrington that his employment would be terminated by February 14, 1989 if he did not submit to the examination.

Harrington appealed the decision to union arbitration and the arbitrator ordered on July 15, 1989 that Harrington be restored to suspended-with-pay status pending completion of the investigation. After consulting a psychologist other than O'Donohue with whom Harrington had been treating, Cole notified Harrington that he would be reinstated on August 10, 1989. Cole wrote to Harrington that he would "anticipate you being assigned to normal patrol duties with no work restriction except those restrictions that apply to all police officers of the City of Old Town."

When Harrington made his first arrest following his reinstatement, the District Attorney's office refused to prosecute it. As a result, Harrington and the police chief agreed that Harrington could not perform all the duties of a patrolman and thus Harrington was assigned desk duties.

---

**1.** The District Court granted summary judgment as to the Department of Human Services' employees named as defendants by Harrington in this action. Harrington's appeal of that judgment was dismissed as part of a settlement of the claims against those employees. Consequently, the Department of Human Services' aspect of Harrington's complaint is not before us for review.

## II

Presented for consideration in this appeal are certain civil rights claims Harrington brought against two groups of defendants: the prosecutorial defendants, District Attorney Almy and Deputy District Attorney Michael Roberts, and the Old Town defendants, City Manager Cole and the City of Old Town. Following discovery, these defendants moved for summary judgment. In a comprehensive memorandum, Magistrate Judge Cohen recommended the grant of the defendants' motions. As pertinent here, the Magistrate Judge found the prosecutorial defendants were entitled to absolute immunity for their decision not to prosecute Harrington's cases and further that any injunctive relief would be "antithetical to the purposes such immunity serves." With respect to the Old Town defendants, the Magistrate Judge found City Manager Cole entitled to qualified immunity from Harrington's claims and that the actions of Cole could not provide a basis for liability on the part of the City of Old Town. Chief Judge Carter concurred in the recommended decision and affirmed the grants of summary judgment.

## III

■ We agree that the claims Harrington continues to press against District Attorney Almy and Deputy District Attorney Roberts, the prosecutor principally responsible for conducting prosecutions of the Lawrence children's allegations, are unable to overcome the absolute immunity afforded a prosecutor from judicial review of prosecutorial decisions. A prosecutor is entitled to absolute immunity for conduct associated with the initiation of a prosecution. *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 996, 47 L.Ed.2d 128 (1976). The conduct of the District Attorney's Office complained of here—"District Attorney Almy's refusal to prosecute cases brought by Officer Harrington"[2]—is squarely within the scope of that immunity. To be sure, this action—or more accurately refusal to act—is not the customary predicate for a civil rights claim against prosecutors. Ordinarily the complainant in such an action is a person who claims to have been improperly charged by a prosecutor. *See, e.g., Celia v. O'Malley,* 918 F.2d 1017

(1st Cir.1990); *Campbell v. State of Maine,* 787 F.2d 776 (1st Cir.1986); *Siano v. Justices of Massachusetts,* 698 F.2d 52 (1st Cir.), *cert. denied,* 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 91 (1983). But the interest that prosecutorial immunity is designed to protect—independence in the charging decision—is implicated whether the decision is to initiate a prosecution or decline to do so. *See Meade v. Grubbs,* 841 F.2d 1512, 1532–33 (10th Cir.1988) (absolute immunity for failure to initiate civil or criminal complaint against state officials for civil rights violations); *Doe v. Mayor and City Council of Pocomoke City,* 745 F.Supp. 1137, 1140–41 (D.Md.1990) (absolute immunity for prosecutor's refusal to prosecute sexual assault cases).

■ In *Imbler* and a more recent discussion of prosecutorial immunity in *Burns v. Reed,* —— U.S. ——, ——, 111 S.Ct. 1934, 1941–42, 114 L.Ed.2d 547 (1991), the Supreme Court has made clear that the availability of absolute immunity turns on a functional analysis of the prosecutorial activity under consideration. The decision whether or not to charge is at the core of the prosecutorial functions the courts have sought to insulate from second guessing through civil litigation. "A prosecutor is duty bound to exercise his best judgment both *in deciding which suits to bring* and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Imbler,* 424 U.S. at 424–25, 96 S.Ct. at 992 (emphasis supplied).

Those most sensitive to the proper role of the prosecutor have long recognized that the crucial discretionary decision a prosecutor makes in the judicial system is whether to charge. As Justice Jackson described the issue in a speech to United States Attorneys when he was Attorney General:

> One of the greatest difficulties of the position is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints ... What every prosecutor is practically required to do is to select the cases for prosecution and to select those in which the offense is the most

<hr>

2. Harrington's statement of issues on appeal as to the District Attorney defendant only addresses "the refusal to prosecute cases brought by Officer Harrington." Accordingly, we do not confront any other actions, including advice to City Manager Cole, undertaken by the District Attorney regarding Harrington.

flagrant, the public harm the greatest and the proof the most certain.

Jackson, "The Federal Prosecutor," 24 *J.Am. Judicature Soc'y* 18 (1940). The selection process for charging generally turns on delicate issues of witness credibility. The *Imbler* Court noted that "[t]he veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify ... If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases would often be denied relevant evidence." 424 U.S. at 426, 96 S.Ct. at 993.

The facts of *Imbler*, where a discredited prosecution spawned the civil rights action, frame the question in terms of the decision to charge. But, given the availability of immunity for the decision *to* charge, it becomes even more important that symmetrical protection be available for the decision *not to* charge. The asymmetrical availability of immunity only for prosecutions undertaken but not for those foregone should not be a factor which induces a prosecutor to choose to initiate questionable prosecutions relying upon witnesses the prosecution does not believe credible in order to avoid liability for declining to prosecute. Any lack of symmetry could only exacerbate "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423, 96 S.Ct. at 991.

The Supreme Court has identified that public trust in eloquent language.

Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life. For this reason, we must have assurance that those who wield this power will be guided solely by their sense of public responsibility.

*Young v. United States ex rel. Vuitton et fils S.A.*, 481 U.S. 787, 814, 107 S.Ct. 2124, 2141, 95 L.Ed.2d 740 (1987). Exposing a prosecutor to civil damage actions for exercising independent judgment whether to expose a citizen to "the public glare of criminal accusation" would only insure that the decision to charge is made by considerations irrelevant to an appropriate "sense of public responsibility." The absolute immunity doctrine is designed to prevent precisely such a result.

Harrington attempts to avoid the application of absolute prosecutorial immunity by seeking injunctive relief apart from his damage claims. But injunctive relief in this setting would do violence to prosecutorial independence even more directly than would the prospect of a damage action. Moreover, it is not relief familiar to the federal courts. In the federal system, the separation of powers proscribes a judicial direction that a prosecutor commence a particular prosecution. *See generally, United States v. Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). Even in the administrative context, where the presumption of judicial review is subject to very narrow exception, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971) and may be overcome only upon "clear and convincing evidence," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967), the decision not to undertake enforcement actions has been found unreviewable under the federal Administrative Procedure Act. *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

Principles of federalism implicated here reinforce the traditional reluctance of federal courts to second guess prosecutorial decisions not to initiate proceedings. We have in other contexts noted that the development of *"Younger abstention,"* a federal court doctrine designed to restrict federal court supervision of ongoing state judicial proceedings, "arises out of the federal courts' hesitance to interfere with a state's good faith efforts to enforce its own law in its own courts." *Duty Free Shop v. Administracion De Terrenos*, 889 F.2d 1181, 1182 (1st Cir.1989). That hesitance is an appropriate equitable consideration in this case. We do not confront a prosecutorial policy in which the charging decision turns on suspect class distinctions, for example, a prosecutor's determination not to prosecute cases brought by black police officers. Such a policy would implicate the overriding constitutional concerns which led to

enactment of § 1983 and would no doubt require a different balancing of competing policies. Rather, here we face an individualized judgment regarding whether the presence of a particular policeman as investigating officer or otherwise as a witness would burden or compromise the prosecution's cases.[3] The judgment may be wrongheaded, but it is the prosecutor's to make free from damage actions or injunctive oversight in the federal court.

We recognize that our caselaw has referred to "the checks inherent in the judicial process, including judicial supervision and the adversarial nature of trial [which] reduce the likelihood of prosecutorial abuse ... [and] mitigat[e] any damages that might result." Celia v. O'Malley, 918 F.2d at 1020. Those checks are not fully present here because by its very nature the decision not to charge when Harrington is involved means that the prosecutorial decision will not be put in the framework for adversarial testing and judicial supervision at trial or on appeal. The availability of the safeguards which arise from trial, however, are not necessary preconditions to prosecutorial immunity. Indeed, such safeguards were not even mentioned when the Supreme Court in Imbler explained "that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs." 424 U.S. at 428–29, 96 S.Ct. at 994. Rather in Imbler the Court referred to criminal prosecution or professional discipline of the miscreant prosecutor as the readily available safeguards against constitutional abuse. Id. at 429, 96 S.Ct. at 994. Those checks are available here as well. Moreover, unlike the federal judicial system where the power of the courts to control a prosecutor's term are strictly limited, cf. Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101

L.Ed.2d 569 (1988), Maine provides a highly specific mechanism to evaluate a prosecutor's work. Maine permits a judicial proceeding to be commenced against a District Attorney, upon complaint by the Attorney General, to determine whether the District Attorney is "performing the duties of office faithfully and efficiently" and to remove him if he is not. Me.Rev.Stat.Ann. tit. 30–A, § 257 (West 1991). It is clearly a matter within the power of the Justices of Maine's Supreme Judicial Court upon complaint by the Attorney General to determine whether the decision of the defendants not to prosecute Harrington's cases amounts to a performance less than faithful to the office. Any authority the federal courts may have to exercise an unfamiliar power to supervise decisions not to prosecute must be tempered by equitable restraint in recognition of these state court powers of supervision.

In brief, we conclude that the absolute immunity prosecutors enjoy from civil actions arising out of their charging decisions bars any damages for the claims Harrington presents to us. Moreover, respect for the principles of prosecutorial independence which support such immunity, coupled with sensitivity to separation of powers concerns and the reluctance of federal courts to interfere with state criminal process, counsel against any injunctive relief in these circumstances. Accordingly, we affirm the district court's grant of summary judgment to the prosecutorial defendants Almy and Roberts.

## IV

On appeal Harrington has narrowed the claims he is pressing against City Manager Cole and the City of Old Town to the questions whether the "mandate that Harring-

---

**3.** Harrington attempts to distinguish the typical case, in which an accused sues a prosecutor for improper charging in a *single* matter, from the instant case, in which the prosecutor refuses to pursue *all* matters involving a police officer investigated for sexually abusive conduct. According to the plaintiff, the latter decision is "administrative" in nature and thus beyond the reach of prosecutorial immunity. We reject this rhetorical distinction. In both the typical case and the one now before us, the prosecutor's decision relates directly to the initiation of prosecutions—the precise zone of decision-making the Supreme Court has placed at the center of the immunity doctrine. In both cases, the prosecutor is fulfilling his role as the officer in the judicial process charged with the responsibility

of determining which prosecutions will best serve the public interest. Whatever may be the limitations on a prosecutor's immunity when acting in his role "as administrator or investigative officer," Imbler v. Pachtman, 424 U.S. 409, 430–31 & n. 33, 96 S.Ct. at 996 & n. 33 (1976) (reserving on question); cf. Burns v. Reed, —— U.S. ——, ——–——, 111 S.Ct. 1934, 1942–45, 114 L.Ed.2d 547 (1991) (declining to extend absolute immunity to prosecutorial function of giving advice to police), those limitations are inapplicable here where the prosecutorial defendant's activity complained of is at the heart of what it means to be "advocate for the State." Imbler, 424 U.S. at 431 & n. 33, 96 S.Ct. at 996 n. 33.

ton undergo a penile plethysmograph" was either "a violation of Harrington's privacy interest" or "a violation of Harrington's substantive due process." The threshold question is whether a finder of fact could conclude that a constitutionally protected right was violated by the unexecuted mandate that Harrington submit to a penile plethysmograph. It is only if such a right has been implicated that we evaluate the ultimate questions: (i) as to Cole, whether the right was clearly established at the time of the violation; and (ii) as to the City, whether the violation was pursuant to some policy or practice of municipal administration.

At the outset we note that the plethysmograph was never actually administered upon Harrington. While perhaps relevant on the question of damages, however, the fact that the test was not administered is not material to the question before us. Cole and the City of Old Town were not free to condition Harrington's employment on a waiver of his constitutional rights. *Blackburn v. Snow*, 771 F.2d 556, 568 (1st Cir.1985). ("Government may not condition access to even a gratuitous benefit ... upon the sacrifice of a constitutional right"); *see also Hall v. Ochs*, 817 F.2d 920, 924 (1st Cir.1987). Thus, putting Harrington to the choice between his employment and being free of a plethysmograph would be sufficient to establish a constitutional violation if requiring one to submit to a plethysmograph would itself involve a constitutional violation. Accordingly, we turn to the question whether requiring a public employee such as Harrington to submit may be considered a constitutional violation.

### A. Privacy Rights

 Although not fully developed in the briefing, it appears that the distinctive privacy claim asserted by Harrington is the right to be free from the gathering of highly personal information regarding his psychological fitness. In the context of sensitive public jobs, we have recognized the government's right to condition such employment on psychological evaluation if the employee's psychological fitness has been put in question. *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir.1988) (psychiatric examination); *Lyons v. Sullivan*, 602 F.2d 7, 10 (1st Cir.) (psychiatric examination), *cert. denied*, 444 U.S. 876, 100 S.Ct. 159, 62 L.Ed.2d 104 (1979). Given the serious allegations of misconduct arising out of inappropriate sexual activity, we can find no privacy right violated by the decision to require development of the information which the plethysmograph is apparently designed to provide. The goal of uncovering personal information regarding Harrington's sexual profile is not one the defendants were barred from pursuing in this context.

### B. Substantive Due Process

 In contrast to the goal of obtaining information regarding Harrington's sexual profile, the specific means chosen here implicate a separate branch of constitutional rights: those of substantive due process. We have characterized substantive due process as "impos[ing] limits on what a state may do regardless of what procedural protection is provided." *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). To support a substantive due process claim, Harrington must establish either that the defendant's actions were sufficient to "shock the conscience," *id.* quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), or were "a violation of an identified liberty or property interest protected by the due process clause." *Id.* That interest here is the familiar Fourth Amendment right to be free from unwarranted searches or seizures which is protected against state action through the due process clause of the Fourteenth Amendment. *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1360–61, 93 L.Ed. 1782 (1949).

 Both of these alternative approaches to substantive due process analysis have focussed on state action undertaking unwanted manipulations of an individual's body.[4] While *Rochin* found a due pro-

---

**4.** In *Clark v. Taylor*, 710 F.2d 4, 8 (1st Cir.1983), we were not required to locate the precise source of a plaintiff's constitutional "right not to have unwanted and dangerous things done to his body" and treated as acceptable jury findings that such action could create liability for "denying plaintiff's constitutional rights of privacy, due process and freedom from unreasonable searches." Given the manner in which Harrington has styled his claims on appeal and the "alternative tests by which substantive due process is examined," *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991), we believe that analytical clarity is best achieved here by framing the issue as whether there has been a denial of substantive due process rights.

cess violation when evidence was extracted from the body of a criminal defendant against his will by means of a stomach pump, the courts have not established a *per se* bar to unwanted intrusions upon or manipulations of a citizen's body by agents of the state. Thus, the Supreme Court has upheld against a substantive due process challenge the use of a hypodermic needle to extract blood from an unconscious accident victim in order to test for alcohol. *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). This holding was reaffirmed in *Schmerber v. California*, 384 U.S. 757, 760, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966). Critical to the *Breithaupt* court's determination was the understanding that "the test as administered here would not be considered offensive by even the most delicate" and involved a procedure which "has become routine in our everyday life." 352 U.S. at 436, 77 S.Ct. at 410.

More recently the Court revisited the limitations on state intrusions into an individual's body in the context of a Fourth Amendment challenge to a surgical procedure under a general anesthetic designed to remove a bullet lodged in the chest of an armed robbery suspect. *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Acknowledging that *"Schmerber* recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity," *id.* at 762, 105 S.Ct. at 1617, the Court nevertheless found the surgical procedure at issue in *Winston* too intrusive an imposition on the suspect's privacy interests in the absence of a compelling need for this particular method of gathering evidence. *Id.* at 766, 105 S.Ct. at 1619–20.

The evolving case law governing unwanted bodily intrusions or manipulations has weighed several relevant considerations. Once it is established that, as here, the state is entitled to the information the bodily intrusion is designed to obtain, the means used will be measured by its reasonableness in light of the need to obtain the evidence in this way. To the degree the procedure would not be considered offensive even by the most delicate and is routine, it will be less likely to involve a constitutional violation. By contrast, nonroutine manipulative intrusions on bodily integrity will be subject to heightened scrutiny to determine, *inter alia,* whether there are less intrusive alternatives available.

A reasonable finder of fact could conclude that requiring the plethysmograph involves a substantive due process violation. The procedure, from all that appears, is hardly routine. One does not have to cultivate particularly delicate sensibilities to believe degrading the process of having a strain gauge strapped to an individual's genitals while sexually explicit pictures are displayed in an effort to determine his sexual arousal patterns. The procedure involves bodily manipulation of the most intimate sort. There has been no showing regarding the procedure's reliability and, in light of other psychological evaluative tools available, there has been no demonstration that other less intrusive means of obtaining the relevant information are not sufficient.

It is at this point that it becomes important to emphasize we review this case after the grant of summary judgment. The record is limited. The parties have not introduced evidence fully detailing the nature of the plethysmograph procedure, its acceptance in the psychological community and the precise impacts upon those who must submit to it. Whether or not the Magistrate Judge substantially understated matters when he found merely that Cole's insistence on the plethysmograph evaluation "may have been questionable," it is clear that such questions as arise from its use must be answered by a finder of fact before a definitive determination can be made under substantive due process analysis whether Harrington's constitutional rights were violated by being put to the choice of submitting to a plethysmograph or losing his job.

V

The summary judgment granted in favor of Cole may not be reversed merely on our

determination that there are genuine issues of material fact regarding the propriety of the plethysmograph in this context. So long as Cole's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), he is entitled to qualified immunity. In order to be considered "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). As we have recently noted "[t]he fact that a violation occurred is not enough to pierce the shield of qualified immunity 'unless it is further demonstrated that [the defendants'] conduct was unreasonable under the applicable standard.' *Davis v. Sherer*, 468 U.S. 183, 190 [104 S.Ct. 3012, 3017, 82 L.Ed.2d 139] (1984); *accord Amsden v. Moran*, 904 F.2d 748, 751 (1st Cir.1990) *cert. denied* [—— U.S. ——], 111 S.Ct. 713 [112 L.Ed.2d 702] (1991)." *Quintero de Quintero v. Aponte–Roque*, 974 F.2d 226, 228 (1st Cir.1992).

This is the unusual case in which the question whether a constitutional right has been violated and the question whether that right was clearly established are essentially coincident. It was clearly established as of 1989 that an unreasonable intrusion by the state upon the bodily integrity of an individual would be a violation of substantive due process rights. Whether the intrusion here was unreasonable is a matter for a finder of fact at trial. This cannot be decided on the summary judgment record before us. "[W]hen only a fact finder's determination of the conflicting evidence as to the underlying historical facts will permit resolution of the immunity issue ... summary judgment ceases to be an appropriate vehicle." *Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991). While the underlying antecedent facts genuinely in dispute here regarding the availability of immunity are not, strictly speaking, historical—but rather go to the nature of the plethysmograph, its acceptability among mental health professionals and the public and alternative evaluative procedures—the principle remains that summary judgment is not the appropriate vehicle for their resolution. Consequently, the summary judgment granted Cole must be reversed.

## VI

Because we have determined that by unsuccessfully seeking to have Harrington submit to a plethysmograph testing, Cole can be found to have violated the substantive due process rights which Harrington asserts on appeal, we must confront the question whether there is a basis to find City of Old Town liable. The Magistrate Judge found the City not liable because "Harrington does not adduce sufficient evidence that Cole acted pursuant to official policy or custom." We disagree. Here Cole testified in deposition that it was "my understanding that I had the authority to issue this order ... [b]ased on my position as the City Manager for the City of Old Town" to condition Harrington's employment on submitting to the plethysmograph.

While a municipality is responsible only for acts which represent its policy or custom, *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), a single decision can be a policy for *Monell* purposes, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (majority), if it is made by the official charged with the final responsibility for making it under local law. *Pembaur*, 475 U.S. at 481–84, 106 S.Ct. at 1299–01 (1986) (plurality). Cole could be found by a finder of fact to be the decisionmaker possessing final authority with respect to employment determinations such as the type of psychological testing necessary to permit reappointment of those police officers subject to sexual abuse allegations. Thus, liability may attach to the City of Old Town "by virtue of unconstitutional action taken on the part of the city manager, if he indeed had the final authority to" condition Harrington's reemploy-

ment upon submitting to the plethysmograph. *Small v. City of Belfast,* 796 F.2d 544, 553 (1st Cir.1986). *See also Cordero v. DeJesus Mendez,* 867 F.2d 1, 7–8 (1st Cir.1989). There is at the least a genuine issue of material fact regarding Cole's authority in this regard and consequently the summary judgment granted the City of Old Town must be reversed.

## VII

For the reasons set forth more fully above, we find the claims against the defendants Almy and Roberts barred by principles of immunity for prosecutorial activity; and we find the privacy and substantive due process claims against the defendants Cole and the City of Old Town must be determined at trial. Accordingly,

The judgment of the district court is

*Affirmed* as to defendants Almy and Roberts, and;

*Reversed* as to defendants Cole and City of Old Town.

On Petition For Rehearing

MEMORANDUM AND ORDER

January 21, 1993

PER CURIAM.

In their petition for rehearing, the defendant Cole and the defendant City of Old Town assert that "this Court finessed the issue whether or not there was a 'clearly established' constitutional right which might have been violated ..." Petition at 10. Rather than such a sleight of hand, the defendants contend, "this Court should itself have determined as a matter of law whether or not the actions of Defendant Cole, on the facts of this case, were *objectively reasonable* thereby entitling Cole to summary judgment ..." *Id.* (emphasis in original)

The problem with the defendants' argument is that the summary judgment motion record in this unusual case did not permit the District Court or this Court to make such a determination as a matter of law. The fountainhead of substantive due process jurisprudence as applied to unwanted manipulations of an individual's body, *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), cautioned against making

due process of law a matter of judicial caprice. The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case "due process of law" requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detached consideration of conflicting claims, on a judgment not *ad hoc* and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society.

*Id.* at 172, 72 S.Ct. at 209.

The Supreme Court has continued to rely in this area upon full record development as a predicate to judgment. That approach was illustrated in the fact-intensive analysis provided by the court in its most recent treatment of the "multifaceted legal inquiry that the court must undertake" in addressing the problem of nonconsensual manipulations of an individual's body. *Winston v. Lee,* 470 U.S. 753, 764 n. 8, 105 S.Ct. 1611, 1618 n. 8, 84 L.Ed.2d 662 (1985).

The task of the fact finder as to liability in this case upon remand will be two fold. First, it must be determined whether the use of a plethysmograph in this setting would have been a constitutionally impermissible intrusion upon the plaintiff's bodily integrity. Second, if the answer to the first question is "Yes," the fact finder must also answer the question whether a public official in defendant Cole's position could reasonably have believed when he made submission to the plethysmograph a condition of reemployment that this would not be an impermissible intrusion on Harrington's bodily integrity. It is only if both questions are answered affirmatively that defendant Cole can be held liable. Those answers by the fact finder will ultimately, of course, be subject to judicial supervision on matters of law.

However, the record assembled on the motion for summary judgment was insufficient to provide an adequate basis for answering these questions at this point "as a matter of law." The jurisprudence of nonconsensual bodily manipulations has developed cautiously and only after full understanding of the underlying facts and relevant context. In the absence of such development here judgment on the underlying questions would be premature.

Accordingly, the petition for rehearing of defendants/appellees is hereby

*Denied.*