United States Court of Appeals
For the First Circuit

No. 97-1958
No. 97-1959
No. 97-1960
No. 97-1961

NORMAN L. BERTHIAUME,

Plaintiff, Appellee,

v.

JEAN CARON, BETTY B. CLARK, JAMES D. BIVINS
and WILLIAM T. O'DONOHUE,

Defendants, Appellants.


APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]


Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.



Paul R. Johnson, William R. Fisher, Edward R. Benjamin, Jr.and Joseph H. Groff, III with whom Harrison L. Richardson, Barri L.
Bloom, Richardson, Whitman, Large & Badger, Monaghan, Leahy,
Hochadel & Libby, Preti, Flaherty, Beliveau & Pachios and Jensen,
Baird, Gardner & Henry were on joint brief for appellants.
Terry A. Fralich with whom Peter J. DeTroy and Norman, Hanson
& DeTroy were on brief for appellee.

April 21, 1998

BOUDIN, Circuit Judge. Norman L. Berthiaume was a Maine
nurse practitioner licensed by the Maine Board of Nursing. In July
1990, Berthiaume pleaded guilty to the violation of 18 U.S.C. 
1462, which prohibits the importation of obscene materials. 
Berthiaume had ordered and received from a United States Customs
Service undercover operation in Mexico, through the mails, a
videotape depicting children engaged in sexual activity. He was
given two years' probation and a $2,000 fine; the sentencing judge
said that the crime was an aberration.
While the charges were still pending, Berthiaume notified
the Board of the situation and applied for a renewal of his nursing
license. He said that he had purchased the child pornography out
of professional interest. In November 1990, the Board met with
Berthiaume and his attorney at an informal conference. Afterwards,
the Board renewed his license on a probationary basis pending a
psychological evaluation by an independent psychologist.
James Bivins, a government lawyer who was advising the
Board, contacted two psychologists in an effort to find someone who
could evaluate Berthiaume. One of the psychologists recommended
Dr. William O'Donohue, a psychologist who was then an assistant
professor at the University of Maine specializing in the evaluation
of sex offenders. Jean Caron, the Board's executive director (a
non-voting staff position), contacted O'Donohue, who told her and
Bivins about the tests he employed and considered appropriate in
such an evaluation.
These tests, O'Donohue told them, included interviews,
filling out surveys, and a penile plethysmograph test. He
explained that in the plethysmograph test, the subject places on
his penis a device that measures its circumference and thus the
level of the subject's arousal as he is shown sexually explicit
slides or listens to sexually explicit audio "scenes." Caron and
Bivins reported their conversation to Betty Clark, the chair of the
Board, who told them to retain O'Donohue's services.
Bivins arranged the evaluation and informed Berthiaume
that it would include a penile plethysmograph test. Berthiaume was
told that if he refused to take the test, the Board would take
steps to revoke his nursing license. Berthiaume expressed
reservations orally and in writing but ultimately agreed to the
test and signed the informed consent form he was given by
O'Donohue. Berthiaume says he signed it under duress and disputes
whether he was given enough information about the test to make his
consent truly informed. 
O'Donohue administered the battery of tests, surveys, and
interviews that he had discussed with Bivins and Caron and sent a
report to the Board. In his report, O'Donohue stated that the
plethysmograph test was "inconclusive." However, O'Donohue made a
diagnosis of probable pedophilia, relying primarily on Berthiaume's
specific request for pornography depicting boys of particular ages
and an admission (later retracted) by Berthiaume during an
interview with O'Donohue that he had regular sexual fantasies about
boys and girls between the ages of 12 and 15.
In December 1990, the Board voted to renew Berthiaume's
license on a probationary basis for two years. He was required to
tell employers and supervisors about his agreement with the Board,
limit his clientele to patients older than 18, and receive
psychological counseling. Berthiaume entered into a consent
agreement with the Board in February 1991 agreeing to these
conditions.
Berthiaume then brought suit in the federal district
court in Maine, seeking damages under 42 U.S.C. 1983 and the
Maine Civil Rights Act, Me. Rev. Stat. Ann. tit. 5, 4682,
alleging violation of his rights under the United States and Maine
constitutions. The defendants included Clark, Caron, Bivins, and
O'Donohue. The defendants countered with a summary judgment
motion asserting defenses of absolute immunity for officials
involved in quasi-judicial proceedings and qualified immunity for
officials who do not violate clearly established rights.
The district court rejected the absolute immunity
defense, which we need not reach. As to qualified immunity, the
district court denied the defendants' request to dismiss, relying
on our decision in Harrington v. Almy, 977 F.2d 37 (1st Cir. 1992);
the court said that "factual issues" remained open that were
necessary to the decision whether the defendants violated a clearly
established right and thus forfeited immunity. These open issues
included:
(1) whether Defendants acted reasonably in
failing to consider alternative approaches to
meeting the Board's need for additional
information without requiring Plaintiff to
take the penile plethysmograph test; (2)
whether the test was shocking, degrading, and
humiliating and, if so, whether Defendants
acted reasonably in failing to consider the
impact of the procedure on Plaintiff; (3)
whether the penile plethysmograph was
scientifically capable of meeting the
legitimate state interest in this case; and
(4) whether the extent of Defendants' inquiry
into the scientific validity of the penile
plethysmograph was reasonable in light of the
intrusiveness and invasiveness of the test.
The defendants have now appealed. At the threshold,
Berthiaume argues that we do not have jurisdiction to consider
these appeals. Ordinarily, the district court's rejection of a
qualified immunity defense is immediately reviewable under the
collateral order doctrine, for reasons explained by the Supreme
Court in Mitchell v. Forsyth, 472 U.S. 511, 524-30 (1985). 
However, the rule is subject to a recent exception established in
Johnson v. Jones, 515 U.S. 304 (1995), which Berthiaume invokes
here. 
In Johnson, the Supreme Court held that interlocutory
appeals would not be permitted to challenge one type of ruling
denying qualified immunity. Where qualified immunity turns on a
question of fact and the district court declines to grant summary
judgment because it says that the fact is genuinely disputed, there
is no interlocutory review. 515 U.S. at 313. The Court's reason
for the exception was prudential; it wanted to foreclose a narrow,
time-consuming inquiry whose resolution by interlocutory appeal was
a game not worth the candle. See id. at 316-17.
Conversely, a defendant who concedes arguendo the facts
found to be disputed is not barred by Johnson from taking an
interlocutory appeal on a legal claim that the defendant is
nevertheless entitled to qualified immunity on facts not
controverted. This view of Johnson, set forth in Stella v. Kelley,
63 F.3d 71, 74 (1st Cir. 1995), has been confirmed by Behrens v.
Pelletier, 516 U.S. 299, 313 (1996). The Court in Behrensrecognized that determining which facts are uncontroverted may
require a certain amount of appellate effort including review of
the record. Id. at 313.
One other point needs to be borne in mind. The genuine
disputes insulated from immediate review under Johnson are those
involving facts, such as what happened. Questions of law
application--for example, whether a set of assumed facts add up to
a constitutional violation--are not so insulated and are ordinarily
subject to de novo review. Behrens, 516 U.S. at 312-13. This is
equally true in deciding whether the assumed facts show a violation
of "clearly established" law. 
We turn now to the "merits" of the immunity dispute: 
whether, assuming that facts found controverted were resolved in
favor of Berthiaume, the defendants were nevertheless entitled to
qualified immunity as a matter of law based upon facts not
controverted. In section 1983 cases, the classical formulation is
that an official is immune if his or her actions did not violate
the plaintiff's "clearly established" constitutional rights. 
Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). Subsequent case
law has elaborated upon this concept in two significant ways:
First, the case law makes clear that the question is not
whether some right has been established clearly at a highly
abstract level, for example, the right to be free from unreasonable
searches and seizures. Rather, the question is whether, under the
circumstances that confronted the official, "a reasonable official
would understand that what he is doing violate[d] that right." 
Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Hunter v.
Bryant, 502 U.S. 224, 228-29 (1991) (per curiam); Brown v. Ives,
129 F.3d 209, 211-12 (1st Cir. 1997), cert. denied, U.S. , 66
U.S.L.W. 3531 (Mar. 23, 1998).
Second, qualified immunity may exist even though in
hindsight a court might determine that the action of the official
violated the Constitution. The doctrine of qualified immunity
leaves "ample room for mistaken judgments" and protects "all but
the plainly incompetent or those who knowingly violate the law." 
Malley v. Briggs, 475 U.S. 335, 341 (1986). This is consistent
with the purpose of qualified immunity to avoid unduly chilling
official action by exposing officials to personal damage liability
for good faith judgments. Harlow, 457 U.S. at 814-15.
Berthiaume describes the defendants' actions as ones that
"shock the conscience" and thereby violate his right to substantive
due process. Rochin v. California, 342 U.S. 165, 172 (1952). 
Alternatively, he claims that the plethysmograph test violated his
right to be free of unwanted bodily searches under the Fourth and
Fourteenth Amendments. Depending on circumstances, these might be
two quite different claims; but in this case we think the
considerations are similar, although the two constitutional
standards are different.
The "shock the conscience" test is, here as in the
ordinary case, largely directed to the substance of what the
defendants did, including the nature of the conduct and the reasons
for it. The same issues of intrusiveness and justification are
pertinent in examining the matter through a Fourth Amendment lens,
where the touchstone is reasonableness. In some cases procedural
issues dominate the Fourth Amendment inquiry--the securing of a
warrant from a neutral magistrate, for example--but Berthiaume
makes no procedural claim in this instance.
Starting with the conduct itself, Berthiaume's main
objection is to the plethysmograph test. Of course, the procedure
was being carried out in the course of a psychological examination,
and there are plenty of ordinary medical procedures that are
disagreeable or upsetting to the patient. Competency examinations
in criminal cases are similarly intrusive. But we think that the
nature of the test in this case would strike most people as
especially unpleasant and offensive.
The problem of justification is more complicated--indeed,
it is the heart of the case--and it needs to be considered at two
different levels. One is the decision to insist that Berthiaume
subject himself to psychological screening, and the other is the
decision to use the plethysmograph test in the course of that
examination. The former involves an administrative judgment, and
the latter implicates some measure of the expertise and the
practice of a profession.
Starting with the administrative judgment, we think it
was not unreasonable, and certainly not shocking, for the Board to
require Berthiaume--as a condition of retaining his nursing
license--to submit to psychological testing by an expert. 
Berthiaume had pled guilty to the federal felony of importing
obscene materials, and the materials involved children engaged in
sexual activity. There was no reason why the Board had to accept
Berthiaume's unvarnished assertion that he had acquired the child
pornography out of professional interest.
The Board is charged under Maine law with responsibility
for the fitness of persons who hold themselves out as nurses. SeeMe. Rev. Stat. Ann. tit. 32, 2101. Like doctors, nurses are a
part of the medical profession and are entrusted with patient care,
where reliance is normally placed on the competence of the nurse or
doctor. Given that children were the subject of Berthiaume's
pornography, many people would have regarded the Board as downright
remiss if it had not insisted on further review.
It is no answer to assert, as Berthiaume does, that
government employment or other benefits cannot be conditioned on a
surrender of constitutional rights. In some contexts this is true,
see Blackburn v. Snow, 771 F.2d 556, 568 (1st Cir. 1985); but in
others, government employment or other benefits may be conditioned
on steps that could not be demanded as of right. E.g., Rankin v.
McPherson, 483 U.S. 378, 388-89 (1987); Wiley v. Mayor and City
Council of Baltimore, 48 F.3d 773, 777-78 (4th Cir.), cert. denied,
516 U.S. 824 (1995). See J. Nowak & R. Rotunda, Constitutional Law 14.46, at 958 (5th ed. 1995).
The more troublesome decision is the use of the penile
plethysmograph, but here the main focus must be upon O'Donohue
rather than the other defendants. There may be procedures so
bizarre that lay persons and lawyers could not conceivably stand
behind a doctor or psychologist who proposed their use. But this
hardly appears to be such a case. Indeed, we conclude that
O'Donohue himself has not engaged in a violation of clearly
established law. It follows that the other defendants did not do
so either.
Whatever its scientific origins, pedophilia does not have
revealing physical features like the measles, and the condition is
one that the patient himself would be likely to deny. Given the
need for inquiry, O'Donohue thus had good reason to consider the
use of any legitimate tool of investigation. The critical question
is whether the test was so far outside the range of legitimate
professional judgment that its use in the present case was shocking
to the conscience, or constitutionally unreasonable, and also
violated clearly established law.
O'Donohue said in his deposition that he regarded the
test as a legitimate one. But O'Donohue's version of the
scientific scene was in some degree controverted by Berthiaume's
expert; just how far is a different question. Given the usual
standard on summary judgment, St. Hilaire v. City of Laconia, 71
F.3d 20, 24 (1st Cir. 1995), cert. denied, U.S. , 116 S. Ct.
2548 (1996), which is doubly appropriate in light of Johnson, we
will assume that Berthiaume's expert is to be believed as to facts,
although not necessarily as to legal labels.
The difficulty is that Berthiaume's own expert does not 
even begin to assert that the penile plethysmograph is quack
science and that its use would be considered outlandish in the
medical community. Rather, he admitted that the device is an
accepted tool in the assessment and treatment of, for example,
known child molesters. He called it "pretty much a standard
practice in treatment programs for sex offenders," and said that by
the late 1980s, the test "had gone from a procedure that was
experimental . . . [to one] being used all over North America by
large numbers of professionals."
This expert's testimony shows a dispute in the scientific
community as to how far the device is useful in assessing people
not previously shown to have deviant sexual interests. The expert
said that the plethysmograph is not useful to identify pedophilia
because the test has a high rate of false negatives, that is to
say, it will pass as normal on persons who are actually pedophiles. 
The expert said that this lack of "sensitivity," combined with its
intrusiveness, made it inappropriate for use in cases (like this
one) where it is used for screening rather than treatment.
But Berthiaume's expert admitted that, while he had
criticized the use of the device for screening purposes in a
monograph, the issue had not been definitively resolved in the
scientific community. Further, he conceded that the device was the
most sensitive of all tools that are employed to screen for
pedophilia--the least worse of a bad lot, in his opinion. Finally,
he agreed with O'Donohue's lawyer that the decision whether to
administer the plethysmograph test was a question of "professional
judgment." 
In short, the situation amounts to this: there was good
reason for the Board to determine whether Berthiaume was afflicted
with pedophilia and only limited means available for that task; the
plethysmograph is widely used in the scientific community for the
treatment of pedophilia; its use for screening is debatable and the
scientific community is not of one mind; and whether to administer
the test was a question of professional judgment. It is doubtful
that this testimony would show negligence in a simple case of
medical malpractice.
Be that as it may, this testimony would not permit the
conclusion that O'Donohue's conduct was so outrageous or
unreasonable as to establish a violation of "clearly established"
law. We need not suppose that a court would necessarily have
upheld a denial of Berthiaume's license if he had refused to take
the test. It is enough that there is no prior case law condemning
the conduct as unconstitutional, nor is it so plainly beyond the
bounds of civilized or rational behavior as to make it an obvious
constitutional violation even without direct precedent.
This brings us to Harrington v. Almy, 977 F.2d 37 (1st
Cir. 1992), relied on by the district court in denying summary
judgment. There, on the basis of doubtful testimony by a child, a
town police officer became one of 170 individuals accused of child
abuse. The police officer was neither formally charged nor
convicted of a crime, but the town's city manager insisted on a
psychological examination, which included the penile
plethysmograph, as a condition of continued police duties. When
the police officer sued under section 1983, this court held that
the claim of qualified immunity by the same manager could not be
resolved on summary judgment.
The court's original opinion asserted that Harrington was
"the unusual case in which the question whether a constitutional
right has been violated and the question whether that right was
clearly established are essentially coincident." Id. at 45. This
proposition is in some tension with the Supreme Court's view that
qualified immunity leaves "ample room for mistaken judgments,"
Malley, 475 U.S. at 341, and with later cases in this circuit. 
Veilleux v. Perschau, 101 F.3d 1, 3 (1st Cir. 1996) (en banc) (per
curiam); Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691,
695 (1st Cir. 1994).
Indeed, in Harrington itself, the court's treatment of
qualified immunity and the merits as coextensive was attacked by a
petition for rehearing urging that the court had not faced up to
the question whether the right was "clearly established." The
court then wrote a memorandum denying rehearing, asserting that the
record on summary judgment was insufficient to decide whether the
device was an impermissible intrusion and whether the city manager
could reasonably have believed it was permissible. See Harrington,
977 F.2d at 46.
Whatever the state of the record in Harrington--and the
opinion reveals nothing about what evidence had been offered by
either side--we think the plaintiffs' own expert in this case
virtually conceded that the use of the test, even for screening, is
a matter of debate and professional judgment. Further, Harrington
itself did not condemn the procedure outright, so it is doubly
difficult to describe its use by O'Donohue as shocking the
conscience or unreasonable under clearly established law. This is
especially so since the basis for any required testing in
Harrington was far slimmer than Berthiaume's guilty plea and
confessed conduct.
One final point remains. We have thus far appeared to
ignore Berthiaume's purported consent to O'Donohue's examination,
including the plethysmograph test. Berthiaume, despite his
objections, gave a written consent and had the advantage of a
lawyer's advice. While the Board was threatening Berthiaume's
license, it would have been easy enough to refuse the test and seek
an immediate injunction against the Board's attempt to revoke the
license or compel the test. Ordinarily, consent would end the
matter.
Nevertheless, Berthiaume has made allegations of duress
and said he had inadequate information about the nature of the
test, and it might be difficult to resolve these issues on the
existing record. Thus, we have assumed arguendo that Berthiaume's
claim is not barred by his consent. Still, the appearance of
consent is highly pertinent. Forcible administration of a test of
this kind would be an entirely different case.
We conclude that the defendants are entitled to qualified
immunity on the claims under the federal Constitution. As the
federal claims must be dismissed prior to trial, and there is no
independent basis for jurisdiction over the state claims, the state
claims should be dismissed without prejudice. See, e.g., Martinezv. Colon, 54 F.3d 980 (1st Cir. 1995); Brennan v. Hendrigan, 888
F.2d 189 (1st Cir. 1989). 
Reversed.