# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

NEVILLE KING,
             *Defendant-Appellant.*

No. 09-50665

D.C. No.
2:08-CR-01111-
DSF-1

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
June 10, 2010—Pasadena, California

Filed June 25, 2010

Before: Dorothy W. Nelson and Ronald M. Gould,
Circuit Judges, and James S. Gwin,* District Judge.

Opinion by Judge Gwin

*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

## COUNSEL

Callie Glanton Steele, Deputy Public Defender, Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Daniel A. Saunders, Assistant United States Attorney, Office of the United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## OPINION

GWIN, District Judge:

Defendant Neville King appeals the district court's judgment revoking his term of supervised release and imposing additional supervised release conditions on the basis of five violations of his supervised release conditions. We have jurisdiction under 28 U.S.C. § 1291.

## I. FACTS AND PROCEDURAL HISTORY

After a jury convicted King of charges of possessing cocaine with the intent to distribute, the United States District Court for the Eastern District of Michigan sentenced him to 235 months of imprisonment followed by five years of supervised release. King began his term of supervised release on March 5, 2008. On September 8, 2008, the Eastern District of Michigan transferred jurisdiction over King's supervised release to the Central District of California.

On May 28, 2009, King's probation officer submitted a report to the district court for the Central District of California alleging seven violations of his supervised release conditions:

1. Associating with convicted felons by accepting telephone calls from federal inmates between February 29, 2008 and September 10, 2008;

2. Associating with convicted felons by e-mailing federal inmates between March 2, 2008 and December 1, 2008;

3. Associating with convicted felons by wiring money to federal inmates;

4. Associating with convicted felon Anna Moore, a Coldwell Banker independent contractor for whom he worked as an assistant, and failing to report that association to his probation officer in his March and April 2008 monthly reports;

5. Failing to submit truthful information to his probation officer in his March and April 2008 monthly reports by misrepresenting that he worked directly for Coldwell Banker, when he actually worked for Anna Moore, an independent contractor for Coldwell Banker;

6. Failing to follow the instructions of his probation officer by failing to submit documentation of his employment

with N-Vest, a real estate venture, from May 2008 through July 2008; and

7. Failing to make court-ordered monthly payments on his fine.

Later, the government dismissed allegation 3, and King admitted to allegation 7.

At the preliminary revocation hearing, King's probation officer asked the district court to modify King's supervised release conditions until the full revocation hearing. After King's counsel objected to the modification proposed by King's probation officer, the district court refashioned the modification, subjecting King and his property (including any computer "confined to his own use") to search upon reasonable suspicion of a violation of supervision or of unlawful conduct. Also, the district court ordered King "not to use a computer that other individuals ha[d] access to." King did not object to the refashioned modification.

After a two-day hearing on the remaining allegations, the district court sustained allegations 1, 2, 4, and 5, and dismissed allegation 6.

With respect to allegations 1 and 2, King's probation officer testified that her investigation revealed—and, upon confrontation, King admitted—that he had regularly communicated by telephone and e-mail with a number of incarcerated felons. King's probation officer also testified that King generally admitted all of the violations in the petition on three other occasions. The district court found King's probation officer's testimony credible.

With respect to allegation 4, King's probation officer testified that, in addition to his three general admissions to the entire petition, King specifically admitted failing to report his knowledge that Anna Moore, his employer, was a felon.

Moreover, although Moore testified that she never told King that she was a felon, she admitted that King obtained his job with her through King's longtime close friend and Moore's ex-husband and drug trafficking co-conspirator, Kevin Moore.

With respect to allegation 5, King's probation officer testified that, in addition to his three general admissions, King specifically admitted to misrepresenting his employment position with Coldwell Banker. Moreover, the probation officer testified that, according to Coldwell Banker, King had never been employed there. And although Anna Moore testified that she considered herself to work for Coldwell Banker, she admitted that she was actually an independent contractor.

Having sustained allegations 1, 2, 4, and 5, the district court sentenced King to nine months of imprisonment followed by 51 months of supervised release with several additional conditions, including (1) a condition that King subject himself and his property to search upon reasonable suspicion of a violation of supervision or of unlawful conduct, and (2) a condition that King not associate with inmates in state or local prisons.

From the district court's judgment, King timely appealed to this Court.

## II.  ANALYSIS

King raises multiple challenges to the district court's revocation of his supervised release term and imposition of additional supervised release conditions.

### A.  Jurisdiction to Revoke Supervised Release for Pre-Transfer Violations

[1] King first argues that the district court lacked jurisdiction to revoke his supervised release for violations he committed before the transfer of jurisdiction from the Eastern District of Michigan—a question of first impression in our circuit.

King's argument fails in light of the statutory text and structure, the absurd results it would yield, and the unanimous opinions of our sister circuits.

**[2]** The text and structure of the statute authorizing transfer of jurisdiction over individuals on supervised release indicates that a transferee court has jurisdiction to revoke supervised release for violations committed before transfer. That statute, 18 U.S.C. § 3605, provides that "[a] court to which jurisdiction is transferred under this section is authorized to exercise all powers over the probationer or releasee that are permitted by this subchapter or subchapter B or D of chapter 227"— which includes the power to "revoke a term of supervised release . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release," *id.* § 3583(e)(3) (part of ch. 227, subchapter D). Under this statutory structure, the transferee court steps into the shoes of the transferor court—which, per § 3583(e), had jurisdiction to revoke supervised release for pre-transfer violations. Section § 3605's language does not limit the transferee court's power to violations that occur after transfer.

If we were to adopt the contrary position (as King urges), two incongruous consequences would follow. First, the contrary rule would create a "twilight zone" of immunity for violations committed—but not discovered—before transfer. Second, the logic of King's argument is not limited to the transferee court's jurisdiction to *revoke* supervised release; it applies with equal force to the transferee court's jurisdiction to *terminate* or *reduce the conditions of* supervised release. *Compare* 18 U.S.C. § 3583(e)(3) (power to "revoke a term of supervised release") *with id.* § 3583(e)(1) (power to "terminate a term of supervised release") *and id.* § 3583(e)(2) (power to "modify, reduce, or enlarge the conditions of supervised release"). Thus, for example, under King's reading of the statute, a transferee court would be powerless to terminate or modify a supervised release term on the basis of the supervisee's good behavior before transfer—forcing the supervisee

to start at square one after each transfer. *Cf. United States v. Miller*, 205 F.3d 1098, 1101 (9th Cir. 2000) (" 'Occasionally, changed circumstances—for instance, exceptionally good behavior by the defendant . . .—will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a).' ") (citation omitted). As a result, even if § 3605 were ambiguous, we would construe it to avoid these absurd results. *See, e.g.*, *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (courts should "avoid, if possible, a[ statutory] interpretation that would produce 'an absurd and unjust result which Congress could not have intended' ") (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)).

Moreover, two other circuits have rejected—and none have adopted—King's position. *See United States v. Bailey*, 257 F. App'x 210, 212 (11th Cir. 2007) (unpublished) ("[B]ased on the plain language of 18 U.S.C. § 3605, the district court for the Northern District of Georgia had the power to revoke Bailey's supervised release as to the case transferred from Alabama, regardless of whether the conduct underlying the revocation was pre-transfer or post-transfer . . . ."); *United States v. Fernandez*, 379 F.3d 270, 275-76 (5th Cir. 2004) (rejecting argument that "Congress intended only that *after* a valid transfer of jurisdiction has taken place, the defendant's *subsequent* commission of a crime in the transferee district would allow the transferee court to address the original supervised release along with the sentence for the new crime"; instead concluding that "[§ 3605's] legislative history clearly indicates that the statute allows the transferor court . . . to transfer jurisdiction *after* charges have been filed against the releasee for a new offense committed . . . before any transfer of jurisdiction") (emphasis in original).

King's reliance on *United States v. Miller*, 547 F.3d 1207 (9th Cir. 2008), is misplaced. There, we held only that a defendant's release under a pre-release program does not trig-

ger the start of his term of supervised release (and thus the applicability of his supervised release conditions). *Id.* at 1212-13. Here, by contrast, there is no dispute that King's violations occurred during his term of supervised release.

**[3]** We thus hold that a transferee court has jurisdiction under 18 U.S.C. § 3605 to revoke a term of supervised release for violations committed before the transfer of jurisdiction.

## B.   Constitutional Challenge to Condition Forbidding "Associat[ion]" With Known Felons

**[4]** Second, King argues that the supervised release condition forbidding him from "associat[ing]" with known felons was unconstitutionally vague—and in particular, that it failed to adequately notify him that phone and e-mail communications with felons were forbidden. A supervised release condition "violates due process of law if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007) (per curiam) (citations and quotation marks omitted).

**[5]** We have on several occasions held that conditions proscribing "association" with a clearly defined group are not impermissibly vague. *See id.* at 867 (holding that supervised release condition forbidding association with criminal street gang members is not unconstitutionally vague); *United States v. Vega*, 545 F.3d 743, 749-50 (9th Cir. 2008) (same)*; United States v. Napulou*, 593 F.3d 1041, 1045 (9th Cir. 2010) (condition forbidding association with persons convicted of misdemeanors is not unconstitutionally vague).

In those decisions, we cabined the dictionary definition of "associate" in three ways to avoid its potentially vague outer boundaries. *See* The American Heritage Dictionary of the English Language (4th ed. 2000) ("to spend time socially;

keep company"); Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to come or be together as partners, friends, or companions"). First, we explained that, consistent with the fundamental presumption that "prohibited criminal acts require an element of *mens rea*," *Vega*, 545 F.3d at 750, non-association conditions prohibit only *knowing* contact with persons that the supervisee *knows* to be felons. *See id.*; *Soltero*, 510 F.3d at 867 n.9. We further limited the meaning of non-association conditions by emphasizing that " 'incidental contacts' . . . do not constitute 'association' . . . ." *Soltero*, 510 F.3d at 866-67 (quoting *Arciniega v. Freeman*, 404 U.S. 4, 4-5 (1971) (per curiam)); *see also* Neil P. Cohen, The Law of Probation and Parole § 9:11 (2d ed. 1999) ("Courts routinely hold that a probation or parole condition proscribing *associating* with a person or group refers to planned, prolonged contact as distinguished from chance or casual meetings."). Finally, we noted that " '[i]f and when [supervised release] is revoked, we will examine the findings to insure that [defendant's] due process right to notice of prohibited conduct has been observed and to protect him from unknowing violations.' " *Vega*, 545 F.3d at 750 (citation omitted) (alterations in original). With these limitations, we concluded that " 'men of common intelligence' need not guess at the meaning of 'association.' " *Soltero*, 510 F.3d at 867; *see also Vega*, 545 F.3d at 749; *Napulou*, 593 F.3d at 1045.

**[6]** Here, moreover, King's probation officer testified that she explained to King at the outset of his supervised release term that he was not to have "any type of contact" with known felons. A probation officer's instructions are relevant to whether a supervised release condition gives fair warning of prohibited conduct. *See United States v. Romero*, 676 F.2d 406, 407 (9th Cir. 1982) ("In addition to the bare words of the probation condition, the probationer may be guided by the further definition, explanations, or instructions of the district court and the probation officer.").

**[7]** Together, the ordinary meaning of "associate," our case law, and King's probation officer's instructions adequately

notified King that telephone and e-mail communications with felons were prohibited. *See Napulou*, 593 F.3d at 1044 n.2 (observing, in summarizing evidence that defendant violated non-association condition, that defendant "had been maintaining daily telephonic contact with Kahau after [defendant's] arrest and incarceration for association with Kahau"). We thus hold that the non-association condition was not unconstitutionally vague.

## C. Sufficiency of the Evidence for Violation Findings

King next argues that insufficient evidence supports three of the district court's violation findings. On a sufficiency-of-the-evidence challenge to a supervised release revocation, we ask whether, " 'viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements' of a violation" by " 'a preponderance of the evidence.' " *United States v. Jeremiah*, 493 F.3d 1042, 1045 (9th Cir. 2007) (citations omitted).

**[8]** First, King challenges the sufficiency of the evidence for the district court's finding that the federal prison inmates with whom King communicated by phone and e-mail were felons (rather than federal misdemeanants). But King's probation officer—whom the district court found credible—testified that King specifically admitted having "been in telephonic and email contact with convicted felons" and that on three other occasions King generally admitted all of the allegations in the petition. Additionally, King's probation officer testified that the Bureau of Prisons records she received indicated that King had been in "regular telephonic and e-mail contact with a number of incarcerated felons." No evidence in the record indicated that any of the inmates with whom King communicated were *not* felons. Viewing this evidence in the light most favorable to the government, a rational judge had ample room to find that the federal inmates with whom King communicated were felons.

**[9]** Second, King argues that the district court lacked sufficient evidence to find that at the time of the alleged violation, he knew that his employer, Anna Moore, was a felon. At the revocation hearing, King's probation officer testified that King specifically admitted failing to report his knowledge that Moore was a felon and generally admitted all of the allegations in the petition on three other occasions. Moreover, King's probation officer testified that when she later confronted him about the violation allegation, he responded that Moore's status as a felon was " 'common knowledge.' "[1] Finally, although Moore testified that she never told King that she was a felon, a rational judge could have concluded that King learned of her felon status from other sources—namely, from King's close friend and Moore's ex-husband and drug trafficking co-conspirator, Kevin Moore, who helped King secure his job as her assistant. This evidence, when viewed in the light most favorable to the government, was sufficient for the district court to find that King knew at the time of the violation that Moore was a felon.

**[10]** Third, King contends that the district court lacked sufficient evidence to find that his misrepresentation to his parole officer that he worked directly for Coldwell Banker—rather than for Moore, an independent contractor for Coldwell Banker—was intentional. At the revocation hearing, King's probation officer testified that King specifically admitted to having misrepresented his position with Coldwell Banker and generally admitted all of the allegations in the petition on three other occasions. And King never produced any documentation suggesting he worked directly for Coldwell Banker; instead, the pay stubs he produced were from "123 Investment Inc." and signed by Anna Moore. King empha-

---

[1]King argues that his response indicated his knowledge of Moore's felon status only at the time of the response—not at the time of the violation. But claiming that her felon status was "common knowledge" makes sense as a defense to the allegation only if King was aware of her status at the time of the violation.

sizes that Moore testified that she considered herself to work for Coldwell Banker, but Moore never claimed to have told King that he worked for Coldwell Banker. Although perhaps open to other interpretations, when viewed in the light most favorable to the government, this evidence was sufficient to support the district court's finding that King's misrepresentation was intentional.

Thus, King's sufficiency-of-the-evidence challenges fail.

### D. Due Process Challenge to Modification of Supervised Release Conditions

Fifth, King argues that the district court violated his due process rights at the initial revocation hearing when it modified his supervised release conditions pending the full revocation hearing by adding a computer search condition without a prior hearing, as required by Federal Rule of Criminal Procedure 32.1(c). King's argument is meritless. The district court held a hearing before adding the computer search condition. Indeed, the district court refashioned the new condition after King objected to the condition as proposed by King's probation officer. King did not object to the refashioned condition.

**[11]** King contends that Rule 32.1(c) prohibits the district court from imposing new conditions without taking any evidence on or sustaining any of the alleged violations. But a Rule 32.1(c) *modification*—as opposed to a Rule 32.1(b) *revocation*—does not require an evidentiary hearing or a violation finding. *Compare* Fed. R. Crim. P. 32.1(b) (providing for, *inter alia*, right to evidentiary hearing and counsel before "revocation") *with* Fed. R. Crim. P. 32.1(c) (providing for "a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation" before "modif[ication]").

## E. Challenges to Additional Post-Revocation Conditions

Finally, King challenges the district court's post-revocation imposition of two additional supervised release conditions: (1) the condition subjecting King and his property to search upon reasonable suspicion of a violation of supervision or of unlawful conduct, and (2) the condition prohibiting King from associating with inmates in state or local prisons. We review the district court's imposition of supervised release conditions for abuse of discretion. *See United States v. Weber*, 451 F.3d 552, 557 (9th Cir. 2006). The district court has "significant discretion" and " 'wide latitude' " to impose supervised release conditions reasonably related to, *inter alia*, the nature and circumstances of the offense, the defendant's history and characteristics, and the sentencing goals of deterring future offenses, protecting the public, and rehabilitating the defendant. *Id.* (citation omitted); *see* 18 U.S.C. § 3583(d).

**[12]** Here, in light of the multiple supervised release violations that the district court found King to have committed and his "complete and obvious pattern of deception" towards the district court and his probation officer, the imposition of the search condition was reasonably related to protecting the public and preventing recidivism. We thus hold that the district court's imposition of this condition was not an abuse of discretion. *See United States v. Betts*, 511 F.3d 872, 876 (9th Cir. 2007) (imposition of search condition with no reasonable suspicion requirement was not abuse of discretion).

**[13]** Likewise, because of those same considerations, and also because of King's history of communicating with inmates in violation of more generally worded supervised release conditions, the district court's imposition of the no-association-with-inmates condition was reasonably related to King's offense and history and to deterring further offenses. *United States v. Napulou*, 593 F.3d 1041 (9th Cir. 2010), cited by King, is not to the contrary. *Napulou* held that a condition forbidding association with persons with misdemeanor con-

victions was not reasonably related to rehabilitation or public safety because its sweep included many currently law-abiding individuals and many individuals who had committed only minor offenses. *Id.* at 1045-46. Here, by contrast, King's condition forbids association only with individuals currently imprisoned for any crime—thereby tending to exclude minor misdemeanors (which rarely result in prison sentences) and law-abiding individuals with long-past convictions.[2]

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's judgment revoking King's supervised release term and imposing additional supervised release conditions.

**AFFIRMED.**

---

[2]King may, of course, obtain special permission to associate with a particular inmate. And as the government represented at argument, the nonassociation condition goes into effect only when King begins his supervised release term—not during his prison sentence. *See also* Neil P. Cohen, The Law of Probation and Parole § 9:11 (2d ed. 1999) ("[C]ourts have used common sense in interpreting nonassociation probation conditions. Often such a condition is part of a long list of terms that includes service of a short jail sentence. Obviously, while in jail probationers cannot comply with a condition dictating that they refrain from associating with persons with a criminal record. In such cases courts wisely hold that the nonassociation condition does not go into effect until after the jail condition has been fulfilled.") (footnotes omitted).